UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE LOMAS,

    Petitioner,

    v.

BEN CURRY, warden,

    Respondent.

No. C 06-4933 MHP (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Steve Lomas, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the parole board's 2005 decision that he was not suitable for parole. The petition will be denied.

## BACKGROUND

Steve Lomas was convicted in 1990 in Los Angeles County Superior Court of second degree murder, conspiracy to commit murder, and two counts of attempted murder. He is currently serving a sentence of 16 years to life in prison. His habeas petition does not concern that conviction directly, but instead focuses on the March 15, 2005 decision by the Board of Parole Hearings ("BPH") to find him not suitable for parole.

The specifics regarding the crime and the circumstances regarding parole suitability are described in the Discussion section later in this order. Briefly, in 1990, Lomas took part in a street gang shooting during which one person was killed and two others wounded. The BPH found him not suitable for parole, relying on the commitment offense, his tumultuous social history, his inadequate participation in substance abuse programs, and his disciplinary record.

Lomas sought relief in the California courts. The Los Angeles County Superior Court denied his petition in a reasoned order. Resp. Exh. G. The California Court of Appeal and California Supreme Court summarily denied his petitions. Resp. Exh. H and I.

Lomas then filed his federal petition for writ of habeas corpus, asserting that his right to due process had been violated. Respondent filed an answer. Lomas filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action occurred at the Correctional Training Facility in Soledad. Soledad is in Monterey County and within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.

2

1  362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner
2  challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d
3  1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A. <u>Due Process Requires That Some Evidence Support A Parole Denial</u>

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board or the governor.  Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies.  One must look to state law to answer the question, "'some evidence' of what?"

3

B.   State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years.  For example, the minimum period for second degree murder is 15 years and for first degree murder is 25 years.  See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code §§ 190.  California's parole scheme described below provides that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §

4

1 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal.
2 Code Regs. § 2402(b).

3 The regulations contain a matrix of suggested base terms for several categories of
4 crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix
5 of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,
6 depending on some of the facts of the crime.  Some prisoners estimate their time to serve
7 based only on the matrix.  However, going straight to the matrix to calculate the sentence
8 puts the cart before the horse because it ignores critical language in the relevant statute and
9 regulations that requires the prisoner first to be found suitable for parole.

10 The statutory scheme places individual suitability for parole above a prisoner's
11 expectancy in early setting of a fixed date designed to ensure term uniformity.  Dannenberg,
12 34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the
13 prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he
14 panel shall set a base term for each life prisoner who is found suitable for parole").  The
15 California Supreme Court's determination of state law in Dannenberg is binding in this
16 federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

17 The California Supreme Court also has determined that the facts of the crime can
18 alone support a sentence longer than the statutory minimum even if everything else about the
19 prisoner is laudable.  "While the Board must point to factors beyond the minimum elements
20 of the crime for which the inmate was committed, it need engage in no further comparative
21 analysis before concluding that the particular facts of the offense make it unsafe, at that time,
22 to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re
23 Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he
24 nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"
25 but might violate due process "where no circumstances of the offense reasonably could be
26 considered more aggravated or violent than the minimum necessary to sustain a conviction
27 for that offense").
28

5

The federal habeas court's task is not to determine whether some evidence supports the reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety." Hayward, 512 F.3d 536, 543 (9th Cir. 2008) (citation omitted).

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction. Four Ninth Circuit cases guide the application of the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, Irons v. Carey, 479 F.3d 658 (9th Cir. 2007), and Hayward v. Marshall, 512 F.3d 536. Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Irons then determined that due process was not violated by the use of the commitment offense and pre-offense criminality to

6

deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that in all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 479 F.3d at 665. Most recently, in Hayward, the Ninth Circuit confronted a case where the prisoner was long past his minimum parole date, and had been in custody for 27 actual years on his 15-to-life sentence. Hayward granted habeas relief to the petitioner, relying on Biggs and Irons, and citing with approval In re. Scott, 133 Cal.App.4th 573, 595 (Cal. Ct. App. 2005) for the proposition that the "'commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.'" Hayward, 512 F.3d at 545.

C.     The BPH's Decision Was Supported By Some Evidence

The BPH determined that Lomas was "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." RT 71. In finding Lomas not suitable for parole, the BPH relied on the commitment offense, Lomas' tumultuous social history, his failure to participate in substance abuse programs, and his disciplinary record in prison.

　　　　1.     The Commitment Offense

The crime was described in a 1999 life prisoner evaluation report and was read into the record at the 2005 hearing. The crime occurred on July 15, 1989, when Lomas, and four of his associates from the La Puentes street gang (Joaquin Valenzuela, Hugo Aceves, Christopher Musselan, and Raymond Luna) drove a stolen van to Valinda.

> They drove to 416 Dixford, . . .stopped, and got out of the van and approached a group whom they believed were members of the Valinda Flats gang. Musselan and Valenzuela opened fire, hitting Anthony Reed in the left hand and Keith Beular . . . in the right thigh. The assailants then reentered the vehicle and drove to Lomas's house, where he picked up a .25 caliber semiautomatic handgun. The group then drove to the corner of Nelson and Stichman . . . Aves. They shouted their gang identity. Valenzuela then set himself on the window ledge of the van and began firing at a group in the street. Albert Sisenia . . . was shot in the back. Lisa Montano . . ., eight months pregnant with a child of victim Mike Tellis, was shot in the left forearm and

> the left lower leg. Mike Tellis, the murder victim, was shot in the back. While lying on the ground, Valenzuela approached him, kicked him several times, shouted, die, motherfucker, die, and shot him in the head. . . .
>
> There is no evidence that prisoner Lomas previously knew Mike Tellis, nor does it appear that prisoner Lomas was identified as the shooter. The degree of violence was extreme, senseless, and random. The weapons were automatic pistols and a sawed-off shotgun. The duration of the offense was not stated directly. However, this writer inferred that the shootings were done quickly, probably within a fire minute time frame.

Respondent's Exh. C, reporter's transcript of 3/15/05 parole hearing ("RT"), at 10-12. The BPH's decision indicates that Lomas only took part in the second half of the episode, RT 72, but it is hardly a model of clarity on the sequence of Lomas' involvement. That is, it is not clear whether the other gang members went on a shooting spree without Lomas and then picked up him and his gun, or whether Lomas was with the gang for both shooting sprees and the gang stopped at his house in between to pick up his gun.

Lomas declined to discuss the particulars of the crime, but claimed to have taken responsibility for his actions and to be remorseful. RT 12-13. Notwithstanding his assertion that he would not discuss the particulars of the crime, he tries in his traverse to downplay his role in the criminal episode by characterizing himself as reluctantly following someone else's directions. Traverse, p. 2. He also asserts that the court of appeal found that his involvement was reluctant, but the citation he offers is to his attorney's statement and not to a court of appeal decision. See Traverse, p. 2, citing to Exhibit A, p. 62. (There is no court of appeal decision in the record.) The conviction that is in place – for murder, two counts of attempted murder, and conspiracy to commit murder – starkly contradicts Lomas' portrayal of his role as that of an unknowing or unwilling participant in this gang shooting.

    2.    <u>Pre-Incarceration History</u>

At the time of the commitment offense, Lomas was 16 years old and had been in the gang since about 15. RT 17. He had no prior juvenile record. RT 14. He had been picked up for shoplifting, but the store representative "fined" him instead of calling the police. RT 14. He had run away from home twice when he was 15, which he attributed to his desire to get away from family problems, including his father's alcohol consumption. RT 15-16. His

8

1  father died of a heroin overdose in 1989.  Lomas had dropped out of school.  RT 18.

2  Lomas had consumed beer and marijuana since age 13.  He also had used cocaine and
3  tried PCP before his incarceration.  RT 16.

4      3.    <u>In-Prison Behavior</u>

5  After Lomas was convicted, he was sent to the California Youth Authority, apparently
6  until about 1995 or 1996, when he was transferred to an adult prison facility.  <u>See</u> RT 19-20;
7  Resp. Exh. F (first disciplinary violation occurred on August 19, 1995).

8  Lomas did not affiliate with a gang while in prison.  RT 19.

9  He obtained his GED in 1992, while at the California Youth Authority.  RT 20.  He
10 also had taken some community college courses, and recently had earned his Bachelor of
11 Arts degree.  RT 21-23

12 For vocational training, he had worked in the PIA textiles and learned how to sew.
13 RT 25, 30.  He also had worked as a cook and received above average work reports.  RT 30.
14 He had been on a waiting list for a welding vocation program at another prison, but never
15 was put in the program. RT 25, 28.  He had received certificates for learning the graphic arts
16 trade in 1996 and the plastering trade in 1992.  RT 26-27.

17 He had participated in A.A. in about 1999, but had stopped.  RT 33.  He claimed he
18 did not want to take up one of the limited slots in the A.A. program  RT 43.  He had started
19 to look for other ways for self-improvement, but had not found any program specifically for
20 drug use, although he had participated in a 13-week Impact program that "does touch on drug
21 use, stuff like that."  RT 34.

22 Lomas had certificates for attendance in courses regarding HIV/AIDS, TB, sexually
23 transmitted disease and hepatitis.  RT 35.  He also had participated in other programs, such as
24 programs in family effectiveness training, how to become a father and not get angry, self-
25 awareness, and a Crim-anon correspondence course.  RT 35-36.

26 Lomas had a notable disciplinary hearing.  He had received four CDC-115 rule
27 violation reports, and two CDC-128A counselling memoranda.  RT 31; Resp. Exh. F.  He
28 had been counseled in 1999 for having a window covering and in 2003 for failure to report.

9

1  He had received CDC-115s for possession of contraband in 1995, possession of tattoo
2  paraphernalia in 1998, possession of contraband in 2000, and falsification of a medical
3  chrono in 2000. He had be assessed time credit forfeitures for 3 of those 4 incidents. Resp.
4  Exh. F.   Lomas received his first CDC-115 on the day he arrived in the adult prison system:
5  he had "keystered" contraband (i.e., money, stamps, address and a pair of tweezers). RT 57.
6  Lomas also had received a "level B" (the equivalent of a CDC-115) while he was in the
7  California Youth Authority for gang activity due to his possession of a picture of someone
8  giving a gang sign. RT 57.

9        His psychological evaluation dated October 21, 2004, was favorable. RT 38-39. It
10 recommended regular attendance in A.A. and frequent monitoring to ensure that the inmate
11 remained alcohol-free. RT 39.  The psychologist stated that Lomas had no more risk for
12 violence than the average citizen. RT 39. In a report done a couple of years earlier, another
13 psychologist opined that it appeared to him that Lomas was "coasting" in prison, i.e., not
14 trying very hard to improve himself. See RT 59.

15       4.    Parole Plans

16       Lomas stated that he had been offered places to stay with his mother, sister and aunt in
17 Los Angeles County, although he first wanted to go to a halfway house. He had been offered
18 a bed in the Miracle House halfway house, and was interested in the Delancey Street
19 program but the latter did not accept applicants without an on-premises interview. RT 41-42.
20 He had a job offer at a law firm at which his aunt worked. RT 42. Lomas also had many
21 letters of support from friends and relatives. RT 45-52.

22       Although Lomas intended to address substance abuse rehabilitation issues at the
23 halfway house, he apparently did not have other plans and explained that he had left the A.A.
24 group in prison because he thought himself taking a space at the A.A. groups "is depriving
25 somebody else who actually needs it who's struggling with dependency issues." RT 43. A
26 commissioner cautioned him that was not a good idea, and substance abuse avoidance was a
27 lifetime effort. RT 43-44. Lomas responded that he would "take your advice concerning
28 substance abuse programs to heart." RT 44.

5. <u>Law Enforcement And District Attorney Opposition</u>

The L.A. County Sheriff's Department sent a letter in which it described the criminal episode and opposed parole. RT 53-56. The district attorney opposed parole for Lomas. RT 59-61. The district attorney thought that Lomas' answers "almost sound glib," and as though they were taken from a handbook about what to say to the parole board. RT 60. The district attorney thought some of Lomas' answers were not credible, e.g., his statements that he did not know about the earlier drive-by shooting before he joined the gang members for the second drive-by shooting and that he smuggled in tweezers because he did not know if they were available in prison to pluck ingrown hairs. RT 60-61. And the district attorney was incredulous that a psychologist could characterize someone who had been an active participant in a gang and a gang-related murder and attempted murders to be less than an average threat to the average citizen. RT 61. (Lomas' attorney corrected that the psychologist had said he was an average risk, not less than an average risk. RT 61.) The district attorney's mere opposition to parole generally does not provide a sufficient ground for denying parole, see <u>Hayward</u>, 512 F.3d at 545 n.9, and for the same reasons, the sheriff's mere opposition generally does not do so either. The district attorney's comments sometimes are helpful in providing a counterpoint to the prisoner's presentation and focusing on problem areas for the candidate.

6. <u>Consideration of Lomas' Case</u>

When the full picture is considered, there was some evidence to support the BPH's denial of parole. As noted above, the BPH relied on the commitment offense, Lomas' tumultuous social history, his failure to participate in substance abuse programs, and his disciplinary record to find Lomas not suitable for parole. With regard to the commitment offense, the BPH stated that the crime was "carried out in a very cruel and callous manner." RT 71. Multiple victims were attacked, with one person being murdered and two others shot. The murder victim was shot and killed in an execution-style murder, although Lomas was not the actual shooter. And the offense was carried out with a total disregard for human suffering. All of these characterizations were correct, but the existence of some evidence to

11

1 support the cited reasons does not end the matter.  See Hayward, 512 F.3d at 543.   There
2 also was some evidence of a tumultuous social history, as Lomas had been in a gang, used
3 drugs and alcohol for three years before this offense was committed at age 16, had run away
4 from home, had an alcoholic father who died of a heroin overdose, had been picked up for
5 shoplifting, and had dropped out of school.  There definitely was some evidence to support
6 the reliance on Lomas' disciplinary record in prison, as he had received several CDC-115s.
7 And there was some evidence of a need for further substance abuse programming: Lomas
8 had dropped out of A.A. six years before the parole hearing and had no ongoing commitment
9 to substance abuse avoidance programming – which was a legitimate concern in light of his
10 pre-incarceration use of alcohol, marijuana, cocaine and PCP.

11      Like many parole candidates, Lomas takes offense at the parole authority's continued
12 reliance on his commitment offense and his pre-incarceration history.  The cluster of Ninth
13 Circuit cases discussed earlier instruct that the BPH can look at immutable events, such as
14 the nature of the conviction offense and pre-conviction criminality to predict current
15 unsuitability, but the weight to be attributed to those immutable events should decrease over
16 time as a predictor of future dangerousness as the years pass *and the prisoner demonstrates*
17 *favorable behavior*.  Here, Lomas has continued to engage in misconduct in prison, so that
18 his behavior undermines rather than supports a view that he has been rehabilitated.
19  Cf. Hayward, 512 F.3d at 544 (absence of recent disciplinary offenses or misconduct weighs
20 in favor of finding inmate presents no probable danger to society).  It as especially telling
21 that he continued to have some gang connection while in the custody of the California Youth
22 Authority and smuggled in contraband when he arrived at the state prison.  That would
23 suggest he had not be rehabilitated at all when he arrived in the adult prison system in 1995
24 or 1996.  He continued to receive rule violation reports and, regardless of whether he
25 considers them serious, they do reflect an unwillingness to follow rules and conform to
26 societal norms.  Although Lomas had many accomplishments in prison, his continuing
27 misconduct including at least one CDC-115 since the most recent parole hearing, takes his
28 case out of the category of cases where the BPH is relying on only pre-incarceration facts

that the prisoner can never change.  Lomas does have control over his behavior in prison, and the BPH may consider misconduct in determining whether he is rehabilitated.  Not only had he engaged in misconduct, he had stopped working on programming focused on avoidance of substance abuse, apparently thinking himself cured of the problem.  As of the time of the BPH hearing, Lomas had been in custody about 15 years on his 16-to-life sentence. Under the circumstances, the BPH's reliance on the circumstances of the murder and unfavorable social history – as well as his in-custody behavior and need to do more substance abuse programming – did not violate due process.

The Los Angeles County Superior Court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for parole denial cases.  See Rosenkrantz, 29 Cal. 4th at 665-67.  The court's decision was a reasonable application of the some evidence standard.  Lomas is not entitled to relief under the standard of 28 U.S.C. § 2254(d).

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  No evidentiary hearing is necessary.  The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 19, 2008

Marilyn Hall Patel
United States District Judge

## **NOTE**

1.     The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).